IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOHN DAVID CORMIER                                                    PLAINTIFF

          v.                              Civil No. 07-5190

STEPHEN CORKERN, Chief of
Police of the Huntsville Police
Department; CAPTAIN ROBERT
BOYD, Madison County Detention
Center; JAILER REBECCA MOUNCE,
Madison County Detention Center;
and OFFICER MIKE LIVERMORE                                            DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, John David Cormier (hereinafter Cormier), brings this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Cormier contends his constitutional rights were denied when excessive force was used against him during his arrest and when he was denied adequate medical care.

Separate defendants Stephen Corkern and Mike Livermore filed a motion for summary judgment (Doc. 36). Separate defendants Captain Robert Boyd and Chief Jailer Rebecca Mounce filed a motion for summary judgment (Doc. 41). To assist plaintiff in responding to the motion, I entered orders (Doc. 52 and Doc. 53), directing Cormier to complete, sign, and return attached questionnaires that would serve as his response to the summary judgment motions. Cormier filed timely responses to the court's questionnaires (Doc. 54 and Doc. 55). The case is currently before the undersigned for the issuance of a report and recommendation on the summary judgment motions.

-1-

## I. BACKGROUND

An arrest warrant was issued for Cormier on February 23, 2006, for failure to appear.

*Plaintiff's Response to the Summary Judgment filed by Captain Boyd and Chief Mounce* (Doc.54

)(hereinafter *Boyd Resp.*) at ¶ 1.  Cormier was treated by Dr. Cooper on March 13, 2006. *Id.* at

¶ 2. Dr. Cooper noted Cormier did not pass a Department of Transportation (DOT) physical in

Louisiana and was started on metformin. *Id.* According to Dr. Cooper, Cormier still had some

medication but was not taking it and had a history of noncompliance. *Id.* Cormier reported

some dizziness and some tinnitus on the right. *Id.* Dr. Cooper's assessment was Diabetes Type

II and tinnitus. *Id.*

Cormier states he worked on the road and was out of town a lot and could not see Dr.

Cooper as much as he wanted Cormier to. *Boyd Resp.* at ¶ 2. Cormier maintains he took his

medication as prescribed but ate pretty much what was furnished by Red Cross volunteers. *Id.*

Tinnitus is the perception of sound in the head when no outside sound is present. *Boyd*

*Resp.* at ¶ 3. It is typically referred to as ringing in the ears. *Id.* It can be a symptom of a

condition that causes hearing loss. *Id.* Cormier agrees but also maintains that loud pressurized

noises, such as that caused by the repeated slamming of a heavy steel door in a small room with

no venting, will cause additional harm and increase harm already present. *Id.*

On July 13, 2006, Cormier was treated by Dr. Christopher Arnold for right shoulder pain

and right hand numbness. *Boyd Resp.* at ¶ 4. It was noted his acromioclavicular (AC) joint was

tender and he had a limited range of motion of his neck. *Id.* He was concerned about a cuff tear

in his right shoulder. *Id.* He wanted to get an magnetic resonance imaging (MRI). *Id.*

AO72A
(Rev. 8/82)

Cormier had an MRI on August 10th.  *Boyd Resp.* at ¶ 5.  Dr. Hussini found the following:  a complete tear of the infraspnatus and supraspinatus tendons with 3.5 cm. retraction; full thickness partial tear of the superior fibers of the teres minor; posterior lateral tear; and mild atrophy of the supraspinatus, infraspinatus and teres minor with moderate atrophy of the deltoid muscle.  *Id.*

On August 15, 2006, Venus Yeazel came to the Huntsville Police Department and reported to Chief Stephen Corkern and Officer Livermore that her two daughters had been sexually molested by her father, and their grandfather, John David Cormier.  *Affidavit of Livermore* at ¶ 3; *Affidavit of Corkern* at ¶ 3; *Plaintiff's Response to the Summary Judgment Motion filed by Stephen Corkern and Mike* Livermore (Doc. 55)(hereinafter *Corkern Resp.*) at ¶ 1(without knowledge to agree or disagree).  Yeazel indicated she wanted to press charges against Cormier.  *Id.*

While Yeazel was talking to Livermore and Corkern, Cormier arrived at the police department.  *Affidavit of Livermore* at ¶ 4; *Affidavit of Corkern* at ¶ 4; *Corkern Resp.* at ¶ 2(without knowledge to agree or disagree). Yeazel said she did not want to see Cormier and she went inside the building.  *Id.*  Cormier stated he wanted to see his daughter.  *Id.*

Livermore informed Cormier that Yeazel was upset and didn't want to see him.  *Affidavit of Livermore* at ¶ 4; *Affidavit of Corkern* at ¶ 4; *Corkern Resp.* at ¶ 3 (without knowledge to agree or disagree).  Cormier responded that if "she won't press charges I'll go away and they won't ever see me again."  *Id.*

Livermore and Corkern stated they had to inform Cormier of his Miranda rights before he made any statements.  *Livermore's Narrative; Corkern's Affidavit* at ¶¶ 5-6; *Livermore's*

-3-

*Affidavit* at ¶¶ 5-7; *Corkern Resp.* at ¶ 4 (without knowledge to agree or disagree). Livermore

then read Corkern his Miranda rights and he said he understood them. *Id.* Cormier then left the

police station and drove away. *Livermore's Narrative; Livermore's Affidavit* at ¶ 8; *Corkern*

*Resp.* at ¶ 5 (without knowledge to agree or disagree).

Livermore asked Yeazel if there were any other children in Cormier's home.

*Livermore's Narrative; Corkern Resp.* at ¶ 6(A) (without knowledge to agree or disagree).

Yeazel said her young teenage son was there. *Id.* She agreed to have Livermore go to pick him

up and deliver him to her at the police department. *Id.*

Livermore went to Cormier's house at 709 Skyline Drive. *Livermore's Narrative;*

*Corkern Resp.* at ¶ 6(B) (without knowledge to agree or disagree). Cormier and his wife invited

Livermore into the house. *Id.* Livermore advised Cormier he was there to pickup Yeazel's son

and deliver him to her at the police department. *Id.* Livermore took Yeazel's son to the police

station. *Id.* Yeazel thought Cormier might possibly leave for Louisiana. *Livermore's Narrative;*

*Corkern Resp.* at ¶ 7 (without knowledge to agree or disagree).

Corkern interviewed both of Cormier's granddaughters about the allegations of rape.

*Livermore's Narrative; Corkern Resp.* at ¶ 8 (without knowledge to agree or disagree).

Livermore and Corkern then ran a background check on Cormier and discovered an outstanding

warrant for his arrest from the Fayetteville Police Department for failure to appear in court.

*Livermore's Narrative; Corkern Resp.* at ¶ 9 (without knowledge to agree or disagree).

After reviewing the evidence, Corkern and Livermore believed there was sufficient

probable cause to arrest Cormier: there was a warrant for failure to appear; his daughter reported

he had sexually assaulted his own grandchildren; the grandchildren had stated he had raped them;

-4-

and he had told Livermore and Corkern that he would leave the city and never be seen or heard from again if his daughter did not file charges against him. *Corkern's Affidavit* at ¶ 9; *Livermore's Affidavit* at ¶ 12; *Corkern Resp.* at ¶ 10(A) (without knowledge to agree or disagree).

Livermore spoke to Deputy Prosecutor Billy Allred and informed him of the information obtained and that they believed probable cause existed for Cormier's physical arrest. *Livermore's Narrative*; *Corkern Resp.* at ¶ 10(B) (without knowledge to agree or disagree). Livermore arrested Cormier at his home on August 15, 2006. *Corkern Resp.* at ¶ 11(A).

According to Livermore, at the time of Cormier's arrest he informed Cormier he was under arrest. *Livermore's Affidavit* at ¶ 13. Cormier, however, states he was never told he was under arrest. *Corkern Resp.* at ¶ 11(B). Instead, he states he was told to step outside to discuss this. *Id.* Once outside he wanted to pat search him and lean against the car. *Id.* When Cormier leaned against the car, he states Livermore began trying to handcuff him. *Id.*

At the time of Cormier's arrest, he was not visibly hurt or suffering from any injury obvious to Livermore. *Corkern Resp.* at ¶ 11(E). Livermore maintains Cormier did not complain of any pain or injury or ask him to be careful when he handcuffed him because he had a pre-existing shoulder injury. *Livermore's Affidavit* at ¶¶ 17-18. Livermore states he advised Cormier to tell him if he was uncomfortable at any time. *Id.* at ¶ 18. He then placed Cormier in his police vehicle. *Id.* At no time, according to Livermore, did Cormier complain of any discomfort. *Id.*

Cormier, however, maintains when Livermore grabbed his right arm when they were in the house to lead him outside, he immediately stated Livermore did not need to grab his arms like

AO72A
(Rev. 8/82)

that because he had rotator cuff damage. *Corkern Resp.* at ¶ 11(F). Cormier indicates he then showed Livermore the medication he was on from Dr. Cooper. *Id.* Cormier contends he constantly complained of being in excessive pain. *Id.* at ¶ 11(H).

He states Livermore continued to try to force the cuffs on his wrists with his hands behind his back causing pain and pressure until tears ran down his face. *Corkern Resp.* at ¶ 11(H). Cormier states he leaned on the car to try to reduce the pressure on the injury he already suffered from. *Id.* at ¶ 21(A). He states his shoulder was popping and it felt like it was tearing inside. *Id.* According to Cormier, Livermore was trying to force his hands "so hard that my left shoulder also began to pop and hurt and all I could do was lay over and beg him to stop because he was hurting me so bad." *Id.* Cormier stated he was not resisting in anyway. *Id.* He indicates he tried to explain that Livermore would have to use a second pair of cuffs in the front of his body. *Id.* Cormier states he was actually cuffed in front of his body but even that hurt extensively because of his size at the time. *Id.* at ¶ 11(I). He states Livermore did not use a second set of cuffs to compensate for the pressure being asserted on his shoulder. *Id.*

Cormier originally alleged Livermore fondled his buttocks while cuffing his hands behind his back. *Corkern Resp.* at ¶ 21(B). Cormier now wants to voluntarily dismiss that claim. *Id.*

After Cormier's arrest, Livermore transported him to the Madison County Jail. *Corkern Resp.* at ¶ 12. Cormier was booked into the jail and detained there. *Id.* at ¶ 13.

While Cormier was detained at the Madison County Jail, he was not visibly hurt and was not suffering from any injury obvious to Corkern. *Corkern Resp.* at ¶ 15. Cormier did not complain of any pain or injury to Corkern. *Id.* at ¶ 16.

-6-

Cormier also contends Corkern slammed the door to cell six once. *Corkern Resp.* at ¶ 22. Cormier was in cell six. *Id.* The cell was approximately eight foot by ten foot in size. *Id.* It had "no opening to allow for the loud vibration to escape." *Id.* Cormier contends it was like being in the center of a bass drum and someone hitting the drum from outside. *Id.* Cormier states Corkern had come to talk to him about the charges against him. *Id.*

Cormier complained about Corkern's action to Chief Jailer Rebecca Mounce. *Corkern Resp.* at ¶ 22. He does not have any medical authority to support his claim that the slamming of the door caused injuries to his ears. *Id.* However, he states he had no problems with, or pain in, his ears until he was in this cell and the cell door was repeatedly slammed shut. *Id.*

When he was booked in, Cormier signed an informed consent for medical services form. *Boyd Resp.* at ¶ 7. The form stated he could request medical care verbally or in writing; that he would be evaluated and treated based on the answers provided on the medical questionnaire; that he would hold Madison County harmless from any pre-existing injury or illness and treatment for such would be at his own expense; that he would be charged for any incurred medical expenses during his incarceration; and that he agreed for the transfer of copies of his medical records to the correctional facility to which he would be transferred. *Id.*

However, Cormier states he was informed if he needed treatment and did not have the funds to pay for the treatment, he would receive the medical care until he had the funds to pay the county back. *Boyd Resp.* at ¶ 7. He asserts this was not done. *Id.* He states he was denied the medication he had at home. *Id.*

Cormier completed and signed a medical questionnaire. *Boyd Resp.* at ¶ 8. He indicated he was taking medication for diabetes, needed a special diet of veggies/fruit and no sugar, that

-7-

he had been hospitalized for a right shoulder, rotator cuff, elbow problem, and he had a right ear failing. *Id.*

On August 15th Cormier refused his meal. *Boyd Resp.* at ¶ 9. Jail personnel called his doctor for instructions. *Id.*

On August 16th Cormier asked his health care provider to fax to Madison County Jail information regarding his prescribed diet and medications. *Boyd Resp.* at ¶ 10(A). Dr. Cooper responded by faxing a letter in which he stated he had last seen Cormier in March of 2006. *Id.* at ¶ 10(B). At the time Dr. Cooper said Cormier was taking ActoPlus Met 15/500 one twice daily. *Id.* Dr. Cooper said he would also recommend a 2000 calorie ADA (American Diabetic Association) diet for Cormier. *Id.* He stated he could not be certain of Cormier's medication since he had not seen Cormier since March of 2006 and also noted he had a history of non-compliance. *Id.*

On August 16, 2006, Cormier received an attorney call and a doctor call. *Boyd Resp.* at ¶ 10(B). On August 30th personnel noted that Cormier was spoken to and reported that he was receiving fair treatment and had no complaints. *Boyd's Ex.* 4. Cormier states he complained to Mounce about the pain in his shoulder and asked to see a doctor. *Boyd Resp.* at ¶ 13. He indicates he also complained about the constant slamming of the steel door. *Id.* at ¶ 13.

During Cormier's incarceration, he received medication including Tylenol, Ibuprofen, amoxicillin, prednisone, loratidine, levaquin, ami-tex, allergy tablets, chlorex, and mucinex. *Boyd Resp.* at ¶ 15. Cormier contends he was denied medical care except for the occasional Tylenol or Ibuprofen tablets until after he was sentenced to the Arkansas Department of

-8-

Correction (ADC). *Id.* Thus, from August 15, 2007, until January 21, 2007, he maintains he was denied treatment for pain in his shoulder, right ear, and diabetes. *Id.*

On January 9, 2007, Cormier entered a negotiated plea of guilty and were sentenced to 240 months with 120 months suspended for 1st degree sexual assault. On January 19, 2007, Cormier requested medical treatment for a sore ear. *Boyd Resp.* at ¶ 21(A). The ADC was contacted regarding responsibility for treatment and responded that they were not responsible until a new commitment had been on the waiting list for 30 days. *Id.*

Dr. Richter of the Boston Mountain Rural Health Center examined Cormier on January 22nd. *Boyd Resp.* at ¶ 21(C). He noted that Cormier was complaining of right ear pain that had been going on for three months. *Id.* Cormier also complained of chronic sinus problems that he typically referred to as allergies. *Id.* Dr. Richter's assessment was eustachian tube dysfunction; allergic rhinitis; and possible acute sinusitis. *Id.* He prescribed amoxicillin 500 mg., three times a day for ten days, Loratadine, ten mg. daily, and Prednisone 20 mg., daily for three days. *Id.* at ¶ 21(D).

On February 2nd Dr. Richter added an addendum. *Boyd Resp.* at ¶ 21(E). He noted Cormier was still having ear pain. *Id.* He prescribed Duratuss for seven days and Levaquin 500 mg. for seven days. *Id.*

On February 22nd the ADC was again contacted about Cormier's complaint of severe earache. *Boyd Resp.* at ¶ 21(F). They were told Cormier had been to the doctor once and had been on medication but was still having trouble. *Id.* The ADC approved Cormier to be seen by the jail doctor. *Id.* Cormier states he was seen by the doctor but has no knowledge of whether the ADC approved it or whether Madison County did it on their own. *Id.* He notes that this

-9-

came only after he had been denied medical treatment for five months prior to his sentencing. *Id.*

Cormier was seen by Dr. Richter on February 28th. *Boyd Resp.* at ¶ 21(G). He noted Cormier's symptoms had been unchanged despite the medication. *Id.* He also noted Cormier had been diagnosed with diabetes and had been on metformin but reported having lost 40 pounds while in jail. *Id.*

Dr. Richter's assessment was eustachian tube dysfunction and history of allergic rhinitis. *Boyd Resp.* at ¶ 21(H). He prescribed an injection of Kenalog 40 mg. to be given intramuscularly, Nalex A one orally two times a day on an as-needed basis and Mucinex D over-the-counter. *Id.*

Cormier states he attempted to discuss his shoulder problems with Dr. Richter but he said the jail had sent him for treatment of an ear condition. *Resp.* at ¶ 40.

Cormier was released to the ADC on March 11, 2007. *Boyd Resp.* at ¶ 22. He was given an intake physical at ADC on March 12, 2007, and again on May 22, 2007. *Id.* at ¶ 24. No loss of hearing was noted on the March 12th physical and his hearing was found to be within normal limits on the May 22nd physical. *Id.* Cormier contends that the conclusion was that his "overall" hearing was to be within normal limits. *Id.* However, he maintains his right ear was found to have some problems. *Id.*

On the May 22nd physical Cormier was noted to be overweight. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 7 at page 1; *Boyd Resp.* at ¶ 25 (without knowledge to agree or disagree). On the March 12th physical Cormier was noted to have a history of sleep apnea, hypertension,

-10-

AO72A
(Rev. 8/82)

Type II diabetes, a limited range of motion in both shoulders, and mild crepitus of the right knee. *Defts' Ex.* 7 at page 3; *Boyd Resp.* at ¶ 26 (without knowledge to agree or disagree).

On a condensed health services encounter it was noted that Cormier told the sick call doctor that he did not have diabetes before incarceration. *Defts' Ex.* 7 at page 12. Cormier stated he had not been on diabetes medication or hypertension medication prior to incarceration. *Id.* Both medications were discontinued. *Id.* Cormier denies having made this statement. *Boyd Resp.* at ¶ 27. He states he argued with the doctor telling him that he did have diabetes and was taking medication on a daily basis. *Id.* Cormier claims the doctor tried to say he didn't have diabetes and attempted to take him off his medication. *Id.*

On July 12th Cormier was seen at sick call by a nurse complaining of ongoing ear problems involving loud humming with sharp pain. *Boyd Resp.* at ¶ 28. Cormier also stated he was having severe headaches and trouble hearing. *Id.* He was to see the doctor on July 18th. *Id.* It was noted there was some redness in his right ear canal and the drum was very white in appearance. *Id.* On July 18th Cormier was seen by Dr. Marvin and prescribed Ibuprofen, Hydrochlorothiazide, and Triamterene. *Defts' Ex.* 7 at page 15; *Boyd Resp.* at ¶ 29 (without knowledge to agree or disagree).

Cormier has no medical records or documentation showing he has suffered a hearing loss. *Boyd Resp.* at ¶ 30. However, he believes the hearing test done at the ADC will show a loss of hearing in his right ear. *Id.* He also maintains he had no problems with his right ear prior to his incarceration at Madison County. *Id.* He asserts that being inside the cell with the slamming door was the equivalent of being inside a drum with someone pounding on it. *Id.*

-11-

Since he was transferred to the ADC, Cormier has been given Ibuprofen for his shoulders and has been put on a weight restriction of zero pounds with his right arm. *Resp.* at ¶ 33. He has a ten pound weight restriction for his left arm. *Id.*

Cormier maintains Boyd deliberately slammed the cell door in an effort to cause injury to him. *Boyd Resp.* at ¶ 34. Cormier states he had already complained of the pain the slamming caused his right ear before Boyd entered his cell. *Id.* Cormier indicates he heard Mounce relay the information to Boyd who said Cormier would not receive medical treatment until he became a ward of the state. *Id.* When Boyd came to Cormier's cell, it was to convince Cormier to accept the plea bargain being offered by the prosecution. *Id.* Cormier maintains Boyd became very angry when he refused. *Id.* Boyd then slammed the cell door as hard as he could when he left making "the noise in the cell extremely loud and the pressure of air very high so that it pushed against my ear very painfully." *Id.*

With respect to Mounce, Cormier states he explained to her the pain the slamming of the door caused him on several occasions. *Boyd Resp.* at ¶ 35. Despite this, Mounce continued to slam the door and said that "this [was] jail and [I] have to get use to it and deal with it." *Id.*

To the extent his complaint alleged any claims other than an excessive force claim against Livermore and a denial of medical treatment claim against Mounce and Boyd, Cormier asks that those claims be dismissed with prejudice. *Boyd Resp.* at ¶¶ 36-39.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that

-12-

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor."  *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III.  DISCUSSION

As noted above, all defendants have moved for summary judgment on the claims against them.  Plaintiff has indicated he wishes to proceed only on his excessive force claim against Livermore and his denial of medical care claim against Mounce and Boyd.  *See e.g., Boyd Resp.* at ¶ 36; *Corkern Resp.* at ¶ 21(B).

### *Denial of Medical Care*

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard.  *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).  To prevail on an Eighth Amendment claim, Cormier must prove that defendants acted with deliberate indifference to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference

-13-

standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even that gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Medical Services*, 512 F.3d 488*, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

In this case, Cormier's denial of medical care claim centers on his belief that he did not receive adequate or prompt medical care for his ear condition or his right shoulder condition. Both conditions existed prior to his incarceration although he maintains his shoulder condition was aggravated during his arrest by Livermore and his ear condition was made worse by the noise created by the closing or slamming of his cell door.

He concedes jail personnel contacted his doctor for instructions when he refused his meal on August 15, 2006, the day he was booked in. *Boyd Resp.* at ¶ 9. Information regarding his prescribed diet and medications was faxed to the jail on August 16th. *Id.* at ¶ 10(A).

Cormier requested medical care for a sore ear on January 19, 2007, and was taken to the doctor on January 22nd. *Boyd Resp.* at ¶ 21(A) & 21(C). Cormier received the medication prescribed by Dr. Richter. *Id.* at ¶ 21(D). On February 2nd Dr. Richter added an addendum

-14-

noting Cormier was still having ear pain and he prescribed additional medication. *Id.* at ¶ 21(E).

Cormier was again seen by Dr. Richter for ear pain on February 28th. *Boyd Resp.* at ¶ 28(G). Cormier states he attempted to discuss his shoulders with Dr. Richter but was told the jail had only sent Cormier for his ear problems. *Id.* at ¶ 40. No notation of this treatment limitation or of Cormier informing Dr. Richter of his shoulder injury appears in Dr. Richter's clinical notes. *Boyd Ex.* 8.

"Under the Constitution . . . the range of acceptable medical care is broad. Jailers bear only the responsibility to identify medical needs that are so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Jenkins v. County of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009)(internal quotation marks and citations omitted). "The Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Id.*

"To avoid summary judgment an inmate alleging that a delay in treatment constitutes a constitutional deprivation must produce medical evidence to establish that the delay had a detrimental effect." *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006). Cormier has offered no verifiable medical evidence to establish that his hearing or ears were harmed by not being taken to a doctor prior to January of 2007. *Boyd Resp.* at ¶ 30. Nor has he offered any medical evidence to establish the delay in his receiving treatment on his shoulder has caused injury to his shoulder.

Since he left the Madison County Jail on March 11, 2007, more than two years ago, the only treatment he has received is Ibuprofen for shoulder pain and he has been given a job restriction at the ADC that includes no weight lifting with his right arm and a ten pound weight

-15-

lifting restriction on his left harm. *Boyd Resp.* at ¶ 33. *Cf. Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)(inmate who claims about delay in medical treatment must present verifying medical evidence of detrimental effect of delay). I do not believe there are genuine issues of material fact as to whether deliberate indifference to Cormier's serious medical needs was exhibited.

Moreover, there is no evidence Captain Robert Boyd was personally involved in responding to any of Cormier's medical requests nor is there any indication he was consulted about the requests. *See Keeper v. King,* 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility).

### Excessive Force

"We analyze Fourth Amendment excessive force claims under a reasonableness standard to determine whether, in light of the facts and circumstances, the officer's actions were objectively reasonable." *Gill v. Maciejewski*, 546 F.3d 557, 562 (8th Cir. 2008)(citations omitted). "[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Conner*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)(internal quotation marks and citation omitted).

At the time of his arrest, Cormier was not visibly hurt or suffering from any obvious injury. *Corkern Resp.* at ¶ 11(E). He does indicate he told Livermore he did not need to "grab" his arms like that because he had rotator cuff damage in his right shoulder. *Id.* at ¶ 11(F). He also indicates he showed him his medication from Dr. Cooper. *Id.* The medication from Dr.

-16-

Cooper, however, all related to his diabetes and not to his shoulder injury. *See Boyd Ex.* 3. Cormier was cuffed in front of his of his body. *Corkern Resp.* at ¶ 11(I)("I was actually cuffed in front of my body and even this hurt extensively because of my size at the time.").

Cormier contends his right shoulder was re-injured in such a fashion by Livermore's actions and his failure to use a second set of cuffs to relieve the pressure that all medical treatment to that date was voided. *Corkern Resp.* at ¶ 21(C). There is no indication in the medical records that he had undergone any treatment other than having a MRI done. *Boyd Ex.* 5. Furthermore, Cormier presented no medical evidence establishing a physical injury, or the aggravation of an existing physical injury, as a result of the alleged use of force during his arrest. *See Cavataio v. City of Bella Vista*, ___ F.3d ___, 2009 WL 1905439, *4 (8th Cir. July 6, 2009). *See also Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006)(some force reasonably required to arrest and handcuff; relatively minor scrapes and bruises and less-than-permanent aggravation of a prior shoulder condition were *de minimis* injuries that support the conclusion that Krueger did not use excessive force).

## IV. CONCLUSION

At his request, I recommend that plaintiff be allowed to voluntarily dismiss all claims with the exception of his excessive force claim against Mike Livermore and his denial of medical care claim against Captain Robert Boyd and Jailer Rebecca Mounce. This would dismiss all claims against Stephen Corkern. I further recommend that the motion for summary judgment (Doc. 36) filed by Mike Livermore be granted. Finally, I recommend that the motion for summary judgment (Doc. 41) filed by separate defendants Captain Boyd and Chief Jailer Mounce be granted.

-17-

AO72A
(Rev. 8/82)

The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 30th day of July 2009.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)